STATE OF NEBRASKA, APPELLEE, V.
DANNY R. ROBINSON, JR., APPELLANT.
715 N.W.2d 531

Filed June 9, 2006. No. S-05-326.

700

Thomas C. Riley, Douglas County Public Defender, for appellant.

Jon Bruning, Attorney General, and Kevin J. Slimp· for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## I. NATURE OF CASE

Danny R. Robinson, Jr., was convicted of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a felon. He appeals the convictions and the sentences imposed.

## II. SCOPE OF REVIEW

■ The decision whether to grant a motion for mistrial is within the trial court's discretion and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Aguilar*, 268 Neb. 411, 683 N.W.2d 349 (2004).

■ In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Aldaco, ante* p. 160, 710 N.W.2d 101 (2006).

■ Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below. *State v. Griffin*, 270 Neb. 578, 705 N.W.2d 51 (2005).

■ In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *Id.*

## III. FACTS

On January 13, 2001, Dupree Reed and his brother Terez Reed attended a party in Omaha, Nebraska. A confrontation occurred between two street gangs, and shots were fired. Terez died as a

result. On the way to Terez' funeral on January 22, Robinson told Courtney Nelson and James Edwards that he thought Gary Lockett had murdered Terez.

After Terez Reed's funeral, friends and relatives gathered at the home of his aunt. A few hours later, Dupree Reed left the gathering and got into a green Chevrolet Tahoe driven by Robinson. At trial, Dupree described three other people who were in the Tahoe by their gang names: Killer C (Nelson), Boomerang (Edwards), and B Dub (Antonio Witherspoon). Dupree stated that while he was riding in the Tahoe, Robinson said he knew who killed Terez. Robinson was referring to Gary Lockett, whose gang name was "Pipe." As the Tahoe passed a house located in North Omaha, Robinson said, "That's the house that they be at."

Robinson parked the Tahoe, and he and Dupree Reed got out. They approached the above-mentioned house by crossing various yards. According to Dupree, he stayed back by the alley while Robinson jumped a fence and "went on the side [of the house] by the window." Robinson was standing on something, but Dupree could not see what it was. Dupree testified that Robinson was "[r]ight up close" to the house and was looking in the window.

Dupree testified that as he and Robinson walked toward the house, he knew they were going to "shoot it up" because that is what they had said in the Tahoe earlier when they drove past the house. Dupree said that Robinson shot first and that he then started firing. Dupree had a .22-caliber handgun, and he fired six or seven shots at the house. He quit firing because his gun jammed, but Robinson was still shooting. According to Dupree, when they returned to the Tahoe, "[Robinson] said, he'd kill us if we say anything."

Edwards testified that while he waited in the Tahoe, he heard numerous shots fired. He heard different noises that did not sound like they all came from one gun. Edwards said that after he heard the gunfire and saw flashes from the guns, Dupree Reed and Robinson came running back to the Tahoe. When Robinson got into the Tahoe, Edwards saw a 9-mm Beretta gun in Robinson's hands. Edwards noticed that Robinson's weapon had fired all its rounds because it was "cocked all the way back." He said Reed had a .22-caliber "German-style looking gun."

Edwards claimed to be familiar with guns and to have fired them before. Edwards told Robinson that he was not happy with Robinson, and Robinson said, "Don't tell nobody." Edwards testified: "He, like, threatened to kill people or whatever."

Nelson testified that he met Robinson in 1993 and that at that time, Robinson claimed to be affiliated with the "Hilltop Crips" gang. Nelson said he left the funeral reception for Terez Reed in the green Tahoe driven by Robinson. He saw Robinson with a 9-mm handgun, and he saw Dupree Reed with a .22-caliber automatic handgun.

Daniel Lockett was the victim of the above-described shooting. As he was bending down to put on his shoes in the living room of his mother's house in North Omaha, he was shot. Lockett's sister, Teresa Mountain, who was also in the living room, heard at least 15 or 20 shots fired. The gunfire which came through the side window in the front of the house sounded different than the shots she heard in the back. She heard the shots in the front before she heard shots from the back. After the shooting, Mountain shook Daniel, but he did not respond. According to Mountain, Gary Lockett was not in the house at the time of the shooting.

Daniel Lockett died as a result of the incident described above. He sustained four gunshot wounds: one to the right shoulder, two to the right side of his chest, and one to the right forearm. One of the bullets passed through the upper lobe of Lockett's right lung and then through his heart.

Omaha police observed nine bullet holes in the window in the front of the house where the Lockett shooting occurred. Shell casings from a 9-mm handgun and bullet fragments found at the scene were determined to have been fired by the same 9-mm weapon. The bullets retrieved from Lockett's body were most consistent with having been fired from a 9-mm handgun. The police suspected that Daniel Lockett's murder could have been in retaliation for the murder of Terez Reed.

Robinson was subsequently charged with first degree murder in the death of Daniel Lockett, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a felon. Following a jury trial, Robinson was convicted and sentenced to life imprisonment without parole on the murder charge and two consecutive sentences of 5 to 10 years' imprisonment on the use

and possession charges. Other facts will be presented as they relate to the individual assignments of error.

## IV. ASSIGNMENTS OF ERROR

Robinson claims, summarized and renumbered, that the trial court erred when it (1) denied Robinson's motion for mistrial; (2) allowed the State to introduce evidence of Robinson's going to Houston, Texas, and destroying the Tahoe; (3) denied Robinson's motion for further discovery and allowed Courtney Nelson, a jailhouse informer, to testify over Robinson's objection; (4) precluded evidence of a deal between James Edwards, a prosecution witness, and the government, as well as evidence that Edwards was with Gary Lockett when Gary Lockett was shot in an incident not related to the case at bar; (5) precluded Robinson from presenting the testimony of Gary Lockett and Terrell Reed; (6) excluded evidence concerning the alibi of Terrell Reed and Keelan Washington; (7) precluded Robinson from presenting the testimony of Victor Hill, an unavailable witness; (8) violated Robinson's constitutional rights of due process, confrontation, and compulsory process by preventing him from presenting a complete defense; and (9) overruled Robinson's objection during the State's closing argument resulting in facts not in evidence being presented to the jury. Robinson also claims the accumulation of errors requires that the convictions be reversed and the cause remanded for a new trial.

## V. ANALYSIS

### 1. Denied Motion for Mistrial

Robinson claims reversible error in the denial of his motion for mistrial. The decision whether to grant a motion for mistrial is within the trial court's discretion and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Aguilar*, 268 Neb. 411, 683 N.W.2d 349 (2004). Robinson's theory of the case was that Dupree and Terrell Reed murdered Daniel Lockett and that Keelan Washington had driven Dupree and Terrell Reed to and from the house where Lockett was shot. The State's theory was that Robinson and Dupree Reed shot into the house where they believed Gary Lockett was located, in retaliation for Terez Reed's death. Gary Lockett was a member of the "29th

Street Bloods" gang and was a suspect in the shooting death of Terez Reed.

At the commencement of the present trial, the State told the jury that it would hear about gangs and the gangster lifestyle, including acts of retaliation. The State claimed the evidence would show that Robinson was a member of the "Hilltop Gangster Crips" in 2001 and that he planned to kill Gary Lockett in retaliation for the death of Terez Reed. The State claimed that the shooting occurred because Robinson believed that Gary Lockett, a rival gang member, had killed Terez Reed.

In its opening statement, the defense told the jury there was no question but that Daniel Lockett's death was the result of previous actions by other individuals. The defense claimed that Robinson was not involved in this murder and that the State's case was based entirely upon the testimony of jailhouse informers, or "snitches," whose testimony was false.

### (a) First Trial

In June 2004, Robinson was brought to trial, but that trial ended in a mistrial. In the first trial, Bruce Ferrell of the Omaha Police Department testified as to the gang membership of Dupree, Terrell, and Terez Reed; Gary Lockett; and others. On cross-examination, Ferrell stated that as of the time of the first trial, Robinson did not have a gang file with the Omaha Police Department. However, based upon his investigation, Ferrell believed that Robinson fit 3 of the 12 criteria evidencing gang membership. Ferrell based this opinion upon the documents he saw before the first trial, including field observation cards, and the fact that Robinson associated with known gang members and was involved in the gang-related shooting of Daniel Lockett and another gang-related shooting in 2002. Ferrell had personally investigated the shooting involving Robinson in 2002.

### (b) Present Trial

Before Ferrell testified in the present trial, defense counsel moved to preclude the State from presenting evidence of Robinson's background involving gang crimes. The defense claimed that Robinson's involvement in a gang-related shooting in 2002 was not relevant to whether he was in a gang in 2001. Counsel requested the trial court to order the State to tell

its witnesses that in response to questions of how they determined Robinson was in a gang in 2001, the witnesses were not to make any statements about the shooting in 2002. The court sustained this request.

In the present trial, Ferrell testified that he was trained and specialized in gang identification, recognition, and investigation, and other law enforcement activities related to gangs. He stated that gangs existed in the Omaha area in 2001 and that he was familiar with such gangs. In the northeast precinct, the vast majority of gang members were Bloods and Crips. These were street gangs based out of Los Angeles, California, that migrated to Omaha in the late 1980's, and they were antagonistic toward each other. The gangs had begun including in their gang names the names of the streets or the areas in which they lived. In 2001, the main Crip gangs in Omaha were "the Pleasantview/Hilltop group, Murdertown, 40th Avenue, 37th Street, 33rd Street, [and] Small Street." At that time, the Blood gangs included the 29th Street Bloods.

Ferrell testified that the Omaha police used a "12-point criteria," modeled after systems in Denver, Colorado, and Kansas City, Missouri, to identify and track individuals suspected of being gang members. Part of this criteria included whether the persons associated with other known gang members, whether they admitted to being gang members, and whether they were involved in gang-related crimes. The Omaha police had documented Terrell Reed as a suspected member of the Pleasantview/ Hilltop Crips. Gary Lockett was documented as being a member of the 29th Street Bloods. Courtney Nelson was documented as being a Murdertown Crip, as was James Edwards.

On cross-examination, Ferrell was asked about his testimony at the first trial regarding whether police had a gang file on Robinson. Ferrell had testified that at that time, no such file existed but that there were "field cards" concerning Robinson's gang activity which were generated in 1998. Ferrell also had stated that Gary Lockett was a suspect in the death of Terez Reed and that Lockett's street name was "Pipe."

On redirect, the State asked Ferrell whether the fact that the police had no gang file on Robinson meant that he had not met the criteria as a suspected gang member in 2001. Ferrell said that

Robinson had met three of the criteria: He associated with known gang members, he indicated to law enforcement that he was a gang member, and he was involved in a gang-related crime.

Defense counsel objected to Ferrell's response concerning a gang-related crime, moved to strike, and moved for a mistrial. The trial court sustained the objection but overruled the motion for mistrial. The jury was admonished to disregard the portion of Ferrell's testimony regarding Robinson's involvement in a crime. On further redirect, Ferrell stated that in 2001, the police had not documented Robinson as a gang member, but he fit the gang criteria and had admitted being a "Hilltop Gangster."

Following this redirect, defense counsel offered evidence in support of the motion for mistrial. Outside the presence of the jury, Ferrell testified that at the first trial, he stated that Robinson fit the gang-related-crime criteria because of two offenses: the one with which he was currently charged and a gang-related shooting in 2002. At the time of the first trial, those were the only two gang-related crimes involving Robinson that the police had recorded in their gang files.

Ferrell then stated that his present testimony related to a gang-related crime for which Robinson was sent to prison in 1997. He said he did not know about the 1997 crime when he testified in June 2004. Prior to the first trial, Ferrell had not checked the records of the Department of Correctional Services concerning Robinson's prison record. About 2 weeks before the present trial, Ferrell retrieved Robinson's penitentiary file, which showed that in 1997, Robinson had committed a robbery with two other suspected gang members. Ferrell had not told the prosecutor about the 1997 robbery. He believed the 1997 robbery was a gang-related crime because an Omaha city ordinance required that if a gang member was a victim, suspect, or witness to a crime in which gang members were involved, it must be classified as a gang-related incident.

Following this evidentiary hearing, Robinson's counsel moved to include the State's failure to disclose the information regarding the 1997 robbery as a part of the motion for mistrial.

Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such

material. *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001); *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998). The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice. *Id.*

Robinson argues that jurors may have been improperly persuaded that he had a history of being involved not only in gang-related crimes, but also violent gang-related crimes such as driveby shootings. Robinson claims that Ferrell's testimony showed Robinson's bad character as a person who had committed gang-related crimes in the past and that evidence of other crimes is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. See Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 1995).

The trial court instructed the jury to disregard Ferrell's statement concerning Robinson's "involvement in a crime." Thus, that evidence was excluded. The issue is whether Ferrell's statement was so damaging that the court's admonishment could not cure the prejudicial effect.

A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial, especially when, as in this case, an objection or motion to strike the improper material was sustained and the jury was admonished to disregard such material. See *State v. Lotter, supra.* Robinson must prove the alleged error actually prejudiced him. See *id.*

In *Lotter*, despite an order prohibiting discussion of the defendant's criminal background, the prosecution asked the defendant's girl friend why she had gone to Missouri. She answered she had gone to get money with which to bail the defendant (who had been incarcerated on an unrelated charge) " 'out of jail.' " 255 Neb. at 494, 586 N.W.2d at 621. Defense counsel objected, moved for mistrial, and asked the court to admonish the jury to disregard the question and response. As in the present case, the court admonished the jury to disregard the statement, but overruled the motion for mistrial. We concluded no actual prejudice had resulted.

This court has not defined the term "actual prejudice" in the context of the denial of a motion for mistrial. The word "actual" means "[e]xisting in fact; real." Black's Law Dictionary 38 (8th

ed. 2004). We have characterized "prejudice," in the context of alleged ineffective assistance of counsel, as a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Williams*, 224 Neb. 114, 396 N.W.2d 114 (1986). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

■ In the context of erroneous jury instructions in a criminal case, the U.S. Supreme Court has stated that a defendant must show that he was actually prejudiced; that is, he "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." (Emphasis omitted.) *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982). When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case. See, *U.S. v. Wheeler*, 322 F.3d 823 (5th Cir. 2003); *Hester v. BIC Corp.*, 225 F.3d 178 (2d Cir. 2000); *State v. Wildenberg*, 573 N.W.2d 692 (Minn. 1998); *State v. Lyons*, 951 S.W.2d 584 (Mo. 1997).

The record does not show any misconduct by the prosecution with regard to Ferrell's statement about Robinson's involvement in a gang-related crime. Nothing indicates that the prosecutor's questioning of Ferrell was improper or that the prosecutor was responsible for Ferrell's response. Before the first trial, Ferrell had neither obtained nor seen the information from the Department of Correctional Services upon which he concluded that Robinson's 1997 robbery conviction was gang related. Ferrell did not inform the prosecution of this information prior to the second trial.

Robinson's motion in limine was intended to preclude testimony of his alleged involvement in a gang-related shooting in 2002, which Robinson claimed had no bearing on whether he was in a gang in 2001. Robinson requested an order prohibiting the State's witnesses from making any statements about the fact that he was involved in a shooting in 2002.

The jury was not told the nature of the gang-related crime that Ferrell mentioned. Ferrell did not describe the 1997 robbery

or the 2002 shooting to the jury. Furthermore, Ferrell's statement was not the only mention of gang-related crime at the trial. Evidence showed that the crimes for which Robinson was charged were gang related. Throughout the trial, the jury heard evidence about gangs and gang-related activities and crimes, much of which was admitted without objection.

In light of the entire record, we conclude that Ferrell's statement did not prejudice Robinson to such extent as to deny him a fair trial. Other evidence pointed to Robinson's guilt in committing the crimes for which he was charged. We cannot say that Ferrell's statement, which the trial court ordered the jury to disregard, prevented Robinson from receiving a fair trial. The damaging effect of Ferrell's statement was removed by the court's proper admonition to the jury. Under these circumstances, the court did not abuse its discretion in refusing to declare a mistrial.

Robinson also argues that the trial court should have granted his motion for mistrial because the State allegedly did not comply with the rules of discovery. He claims he was not provided with the information Ferrell had retrieved from the Department of Correctional Services concerning Robinson's 1997 robbery conviction.

■ Upon a defendant's proper request through discovery procedure, the State must disclose information which is material to the preparation of a defense to the charge against the defendant. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). In order for the defendant to receive a fair trial, requested and material information must be disclosed to the defendant. *Id.*

■ Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred. *Id.* The trial court's discovery order is not included in the record before us. Assuming, without deciding, that the failure to disclose the 1997 information violated a discovery order, we conclude Robinson has not shown that a mistrial was necessary to avoid a substantial miscarriage of justice resulting from the alleged discovery violation.

The trial court had broad discretion to enter an order as it deemed just under the circumstances. See, Neb. Rev. Stat. § 29-1919 (Reissue 1995); *State v. Surber*, 221 Neb. 714, 380 N.W.2d 293 (1986); *State v. Vicars*, 207 Neb. 325, 299 N.W.2d

421 (1980). The court excluded evidence of Robinson's "involvement in a crime" by instructing the jury to disregard that testimony. An evidentiary hearing was then held on Robinson's motion for mistrial. Specific testimony concerning the 1997 crime was elicited only during the hearing on the motion for mistrial, outside the jury's presence. Clearly, Robinson would have known about the 1997 robbery for which he was convicted and about his gang affiliation.

While we do not condone Ferrell's failure to furnish the information, Robinson has not shown that the outcome of the trial was altered by belated disclosure of the facts surrounding his 1997 conviction. The trial court did not abuse its discretion in denying Robinson's motion for mistrial based on the State's alleged discovery violation.

## 2. ALLEGED RULE 404 EVIDENCE

At trial, the State presented evidence that the day after Daniel Lockett was killed, Robinson told Courtney Nelson he was going to "Kansas or Texas" to "get rid of the truck." Nelson testified that Robinson stated he did not want to hear anybody talking about what he had done the night before and that he would kill anyone who talked. Except for the day after the murder, Nelson had not since seen Robinson in possession of the Tahoe.

The State's evidence established that on January 29, 2001, a green Chevrolet Tahoe registered in Omaha to Robinson's grandmother was found destroyed by fire in a vacant field in Houston. Further evidence was presented that on January 30, a police officer saw Robinson in Kansas City, exiting a bus which had originated in Houston. Robinson had a bus ticket purchased in Houston, and he told the officer that he was traveling to Omaha.

Robinson moved to preclude the testimony of the Kansas City police officer and the evidence regarding the Tahoe. He argues that such evidence was rule 404 evidence of other crimes, wrongs, or acts, and he claims the trial court committed prejudicial error by allowing the State to present this evidence without a hearing as required by rule 404.

The State claims this evidence was intrinsic to the charged conduct and was offered to explain the circumstances of the crimes. It argues that rule 404 was inapplicable and that the evidence was properly admitted without a rule 404 hearing. The trial

court concluded that the destruction of the Tahoe was not a separate event, but part of the original offense, and showed that Robinson had a consciousness of guilt.

### (a) Evidence Intrinsic to Charged Crime

[9] Bad acts that form the factual setting of the crime in issue or that form an integral part of the crime charged are not covered under rule 404(2). *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004); *State v. Aguilar*, 264 Neb. 899, 652 N.W.2d 894 (2002). In *Wisinski*, the defendant was charged with burglary. The State presented evidence that

> "approximately ten days after the reported burglary, [the defendant] was apprehended by Omaha police in a [stolen] vehicle. After the owner of the vehicle recovered it, he noticed in it meat in coolers and a computer printer with paper bearing the name Guaranteed Roofing. Meat and a printer were reported taken in the burglary, and Guaranteed Roofing [was] the name of victim's business."

*State v. Wisinski*, 268 Neb. at 783, 688 N.W.2d at 591.

On appeal, the defendant asserted that information about the stolen van in which he was apprehended was evidence of other crimes subject to rule 404. We concluded that the rule was inapplicable because such information was integral to the State's case. Evaluating the evidence in question, we found that it was

> foundational for establishing that [the defendant] was in possession of the property he was charged with having stolen and that [the vehicle owner's] testimony that his truck had been stolen and that he did not own the items found in it when it was recovered helped establish that the property was stolen.

*State v. Wisinski*, 268 Neb. at 785-86, 688 N.W.2d at 592.

In the present case, the trial court found rule 404 inapplicable to evidence that Robinson had gone to Houston to destroy the Tahoe, because such information was part of the "res gestae" of the charged conduct. In place of the term "res gestae" evidence, "[s]ome courts have substituted phrases such as 'same transaction evidence' or '"complete story" principle[.]'" *U.S. v. Forcelle*, 86 F.3d 838, 841 n.1 (8th Cir. 1996). Such evidence is often referred to as "intrinsic evidence." Evidence in this category

"is admissible for the purpose of providing the context in which the crime occurred." *Id.* at 841. This court has explained:

> " ' "[W]here evidence of other crimes is 'so blended or connected, with the one[s] on trial [so] that proof of one incidentally involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged,' it is admissible as an integral part of the immediate context of the crime charged. When the other crimes evidence is so integrated, it is not extrinsic and therefore not governed by Rule 404 . . . . As such, prior conduct that forms the factual setting of the crime is not rendered inadmissible by rule 404. . . . The State is entitled to present a coherent picture of the facts of the crime charged, and evidence of prior conduct that forms an integral part of the crime charged is not rendered inadmissible under rule 404 merely because the acts are criminal in their own right, but have not been charged. . . . A court does not err in finding rule 404 inapplicable and in accepting prior conduct evidence where the prior conduct evidence is so closely intertwined with the charged crime that the evidence completes the story or provides a total picture of the charged crime. . . ." ' "

(Citations omitted.) *State v. Wisinski*, 268 Neb. 778, 785, 688 N.W.2d 586, 592 (2004), quoting *State v. Powers*, 10 Neb. App. 256, 634 N.W.2d 1 (2001), *disapproved on other grounds, State v. Smith*, 267 Neb. 917, 678 N.W.2d 733 (2004).

Robinson argues that the events in question were not part of the same offense because the "alleged act of burning the truck occurred a week after the homicide and obviously does not include any element of the murder charge." See brief for appellant at 17. In *Wisinski*, however, we applied the above-quoted reasoning regarding *prior* conduct to events which occurred 10 days *after* the charged conduct, finding those events an integral part of the crime. Consequently, the time at which the conduct in question occurs, although a relevant consideration, is not the determining factor for finding such conduct intrinsic to the charged crime. What matters is whether the evidence is so closely intertwined with the charged crime that it completes the story or provides a total picture of that crime. See *State v. Wisinski, supra.*

We conclude that evidence of Robinson's returning from Houston and of the Tahoe's being burned in a field in Houston was intrinsic to the crimes for which he was charged. Testimony was given at trial that Robinson regularly drove a green Chevrolet Tahoe and that he had driven the Tahoe to the scene of the crime on January 22, 2001. The State presented the evidence in question "to show that Robinson desired to get rid of evidence which he deemed may be used as evidence against him." See brief for appellee at 16. As such, it was integral to the charged conduct, and the State was entitled to present a coherent picture of the facts surrounding the crimes charged. The evidence supported Robinson's statement to Nelson that he was going to Texas to "get rid of the truck." Accordingly, the trial court did not err in admitting this evidence without first conducting a hearing pursuant to rule 404.

### (b) Evidence Showing Consciousness of Guilt

We have concluded that the trial court did not err in admitting this evidence without conducting a hearing pursuant to rule 404. Therefore, we decline to address Robinson's arguments concerning the evidence as showing consciousness of guilt.

### (c) Alleged Hearsay Evidence

Robinson argues that if a rule 404 hearing had been held, the State would have found it difficult to prove Robinson went to Houston. He claims that the police officer's testimony about the bus ticket was hearsay. The bus ticket was not presented as evidence.

Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact. *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998). If we assume that the trial court should have excluded the information about the bus ticket as inadmissible hearsay, such error was harmless because the State presented other evidence to show that Robinson had gone to Houston. Courtney Nelson testified that the day after Daniel Lockett was killed, Robinson told Nelson he planned to go to "Kansas or Texas," where he intended to "get rid of the truck." A Houston police officer testified that a green Chevrolet Tahoe registered in

Omaha to Robinson's grandmother was found destroyed by fire in a vacant field in Houston. The Kansas City police officer testified that on January 30, 2001, he saw Robinson exiting a bus arriving from Houston. Robinson identified himself to the officer and told the officer he was traveling to Omaha. Robinson's statements were admissible as nonhearsay under Neb. Evid. R. 801(4)(b), Neb. Rev. Stat. § 27-801(4)(b) (Reissue 1995). A statement is not hearsay if it is offered against a party and is the party's own statement. *State v. Sims*, 244 Neb. 771, 509 N.W.2d 6 (1993).

### 3. MOTION FOR FURTHER DISCOVERY

Before trial, pursuant to Neb. Rev. Stat. § 29-1929 (Cum. Supp. 2004), the State gave notice to Robinson that it intended to call Courtney Nelson, a jailhouse informer, as a witness. Among other requirements, before testimony of a jailhouse informer may be admitted at trial, the State must disclose

> [a]ll cases known to the state in which the jailhouse informer testified or offered statements against a person but was not called as a witness, whether or not the statements were admitted as evidence in the case, and whether the jailhouse informer received any deal, promise, inducement, or benefit in exchange for or subsequent to such testimony or statement.

See § 29-1929(4).

Upon a defendant's proper request through discovery procedure, the State must disclose information which is material to the preparation of a defense to the charge against the defendant. *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). The prosecution must further disclose all material exculpatory evidence, whether or not such information was requested. See *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994).

In addition to giving notice that it planned to call Nelson, the State provided Robinson with a copy of a police report dated January 18, 2004, which contained information Nelson had volunteered in other matters during a "proffer interview" on September 17, 2003. The copy given to Robinson contained numerous redactions of the identities of individuals named by Nelson during the interview. Robinson moved the trial court to

either order the State to provide the entire report without redactions or preclude Nelson from testifying at trial.

Robinson asserts that under § 29-1929(4), "cases" should include any instances in which a jailhouse informer has offered statements against another person. See brief for appellant at 21. He emphasizes that a defendant is "more likely interested in investigating incidents where information given by the informant proved to be unreliable or an outright lie." *Id.*

The State argued that it had complied with § 29-1929, because it had redacted only the names of those individuals who were the subjects of then ongoing police investigations and had not previously been indicted. The State contended that to reveal such names would not only disrupt investigations by the police department, but would create safety risks for parties involved.

The trial court reviewed the redacted and unredacted versions of the police report, determined that the State had complied with § 29-1929, and overruled Robinson's motion for additional discovery. It concluded that the State was not required to disclose the redacted names of individuals who had not been charged with criminal offenses because § 29-1929(4) required the State to disclose only all known "cases" in which the informer testified or offered statements against a person.

■ This court has not previously interpreted § 29-1929. Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below. *State v. Griffin*, 270 Neb. 578, 705 N.W.2d 51 (2005). Statutory language is to be given its plain and ordinary meaning. *State v. Johnson*, 269 Neb. 507, 695 N.W.2d 165 (2005).

■ The word "case" ordinarily means "[a] civil or criminal proceeding, action, suit, or controversy at law or in equity." Black's Law Dictionary 228 (8th ed. 2004). The plain language of § 29-1929(4) requires the prosecution to disclose all instances in which a jailhouse informer has made statements against a person involved in a "case," i.e., when a legal charge has been filed against that person.

We conclude the trial court correctly determined that the State was obligated to disclose only those instances in which the information offered related to a legal charge that had been filed against

a person. Under the plain meaning of "cases" in § 29-1929(4), the court did not err in denying Robinson's request for further discovery or in allowing Nelson to testify.

### 4. EVIDENCE OF ALLEGED DEAL BETWEEN PROSECUTION WITNESS AND GOVERNMENT AND EVIDENCE CONCERNING SUBSEQUENT SHOOTING OF GARY LOCKETT

The State moved to prevent Robinson from calling James Edwards to testify about proffer statements he gave to the police regarding his involvement in three bank robberies. It also moved to preclude evidence that Edwards had been with Gary Lockett (Daniel Lockett's nephew) during a gang-related incident in which Gary Lockett was shot. Robinson wanted to establish that Edwards had a close relationship with Gary Lockett. Both situations occurred over 3 years after the homicide of Daniel Lockett. The trial court sustained the State's motions in limine as to the above-mentioned evidence.

### (a) Alleged Deal Involving Edwards

Robinson wanted to establish that the State had given Edwards immunity regarding the bank robberies. The trial court determined that evidence of the bank robberies was irrelevant.

The existence of an agreement to testify by a witness under threats or promises of leniency made by the prosecutor is relevant to the credibility of such witness, and failure to bring that to the attention of the jury denies the defendant due process of law. *State v. Rice*, 214 Neb. 518, 335 N.W.2d 269 (1983). An expectation of leniency on the part of a witness, absent evidence of any expressed or implied agreement, need not be revealed to the jury. *Id.*

In *Rice*, the defendant claimed the State had failed to disclose alleged promises of leniency or threats made to induce a witness to testify against the defendant. The record, however, was devoid of any proof of the existence of such an agreement. The witness indicated he wished to testify because he felt things would go easier for him if he did. However, the witness repeatedly denied striking a deal with the prosecution. This court determined that the witness "simply had an expectation of leniency, and, as such, absent evidence of any expressed or implied

promise, it need not be revealed to the jury." *Id.* at 523, 335 N.W.2d at 273.

In an unrelated federal case, Edwards had entered a "proffer agreement" to obtain leniency with regard to bank robbery and drug charges in exchange for his testimony in that case. During the present trial, Robinson's counsel was permitted to separately depose Edwards. Edwards repeatedly denied being promised any deal by the State in exchange for his testimony at Robinson's trial. Regarding the existence of any such deal, Edwards said, "I just know I wasn't promised nothing."

Absent evidence of an express or implied agreement, any impression or expectation of leniency on the part of Edwards did not need to be presented to the jury. See *State v. Rice, supra.* Therefore, the trial court did not abuse its discretion when it sustained the State's motion in limine.

### (b) Details Surrounding Shooting of Gary Lockett

Robinson further argues that he should have been permitted to present evidence of a driveby shooting in March 2004 in which Gary Lockett was shot while in the company of Edwards. Robinson claims that this evidence showed a close relationship between Edwards and Gary Lockett, which the jury should have considered in order to weigh Edwards' credibility.

Robinson argues that "the close relationship between Edwards and [Gary] Lockett was only revealed at [Edwards'] deposition taken in mid-trial." Brief for appellant at 23. However, the record reveals that Edwards testified on direct examination that he "grew up" with Gary Lockett and that Gary Lockett was a "friend" at the time of Daniel Lockett's homicide. On cross-examination, Edwards stated that he had known Gary Lockett "[s]ince grade school." Thus, even assuming (without deciding) that the trial court erred in precluding evidence that Edwards had been with Gary Lockett when he was shot, such error was harmless. The evidence would merely be cumulative. See *State v. McLemore*, 261 Neb. 452, 467, 623 N.W.2d 315, 328 (2001) ("[w]here the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt").

### 5. ASSERTION OF FIFTH AMENDMENT PRIVILEGE
### BY GARY LOCKETT AND TERRELL REED

At trial, Robinson wanted the jury to know that he had tried to call Gary Lockett and Terrell Reed as witnesses. The State had endorsed them as witnesses and then had indicated they would not be called by the State. Their attorneys advised all parties that if called, Lockett and Reed would invoke their Fifth Amendment privilege against self-incrimination. The State moved in limine to prevent either witness from appearing before the jury because each planned to assert the Fifth Amendment privilege to all questions asked by the defense. Robinson argued that he wanted to place Lockett and Reed on the stand not to argue any inferences based on their silence, but merely to show the jury that Robinson had called them, because their names had been "floating around the whole trial."

Robinson requested a hearing outside the jury's presence for the trial court to determine if testimony the defense intended to elicit from Gary Lockett and Terrell Reed was covered by the Fifth Amendment privilege against self-incrimination. In chambers, defense counsel informed Lockett of the questions he would be asked if he took the stand. Lockett replied that he would refuse to answer such questions on Fifth Amendment grounds. By affidavit, Reed stated that he would also invoke his Fifth Amendment right and refuse to answer Robinson's questions. The court ruled that the Fifth Amendment covered the information Robinson desired to elicit from Lockett and Reed and refused to compel them to answer because their answers had the potential to be incriminating. The court also denied Robinson's request to order the State to grant use immunity to Lockett and Reed.

Robinson claims the trial court erred in failing to make a proper inquiry to determine whether the witnesses' assertion of their Fifth Amendment privilege was valid, in refusing to allow the presentation of those assertions to the jury, and in refusing to require a grant of use immunity for the witnesses.

### (a) Trial Court's Role in Determining Sufficiency of Fifth Amendment Privilege Against Self-Incrimination

The state and federal Constitutions provide that no person shall be compelled to give evidence against himself or herself of an incriminating nature. See *State v. Bittner*, 188

Neb. 298, 196 N.W.2d 186 (1972). The Fifth Amendment privilege against compulsory self-incrimination extends not only to answers that would in themselves support a conviction but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant. *State v. Lotter*, 266 Neb. 245, 664 N.W.2d 892 (2003). It need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. *Id.* The inquiry is for the court; the witness' assertion does not by itself establish the risk of incrimination. *Id.*

Robinson claims the trial court abdicated its role in deciding the validity of the Fifth Amendment invocation by authorizing a "blanket assertion" of the Fifth Amendment by Gary Lockett and by Terrell Reed. See brief for appellant at 27.

In *Bittner*, this court affirmed the trial court's decision to restrict the defendant's right to cross-examine an accomplice on the basis of the Fifth Amendment privilege against self-incrimination. We explained the trial court's role in determining the sufficiency of the privilege as follows:

> "The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified . . . and to require him to answer if 'it clearly appears to the court that he is mistaken.' "

*State v. Bittner*, 188 Neb. at 300, 196 N.W.2d at 188, quoting *Hoffman v. United States*, 341 U.S. 479, 71 S. Ct. 814, 95 L. Ed. 1118 (1951).

In *Bittner*, we reviewed the record and questioned whether any "possible prejudice appear[ed] [against the witness] except in regard to the question of whether the witness was a prostitute," which "[a]lthough generally forbidden by city ordinance," did not "constitute a crime under state or federal law." 188 Neb. at 299-300, 196 N.W.2d at 188. Although the record did not "throw any light on the situation of the witness in this respect," we recognized that "the guarantee against compulsory self-incrimination 'must be accorded liberal construction in favor

of the right it was intended to secure.' " *Id.* at 300, 196 N.W.2d at 188, quoting *Hoffman v. United States, supra.* Thus, we concluded that the trial court had not abused its discretion because "[i]t [was] entirely possible that such an admission could [have] constitute[d] a link in a chain of evidence required to convict [the witness] of some other offense." *State v. Bittner*, 188 Neb. at 300, 196 N.W.2d at 188.

In the present case, the trial court was required, in the exercise of sound discretion, to determine whether the witnesses' claims of privilege were justifiable. See *id.* The record indicates that the court did so. Outside the presence of the jury, the court conducted a lengthy hearing to determine the privilege issue. The court heard the matters about which defense counsel intended to question Gary Lockett and Terrell Reed. The witnesses—through personal appearance, affidavit, and counsel—asserted that they would invoke their Fifth Amendment right to be silent if questioned about such matters before the jury. After considering the arguments from all involved parties, the witnesses' intentions, and the relevant case law, the court determined that the information Robinson desired to elicit from the witnesses was covered by the Fifth Amendment.

We cannot say the trial court abused its discretion in determining that the witnesses' claims of privilege were justifiable.

(b) Invocation of Fifth Amendment in Presence of Jury

Robinson further claims the trial court erred because it should have required Gary Lockett and Terrell Reed to assert their Fifth Amendment privilege in open court. At trial, Robinson objected to the court's refusal to require the witnesses to assert their privilege before the jury because he would be denied the opportunity to show that he had subpoenaed witnesses whose names had been "floating around the whole trial." He stated that he did not desire to place the witnesses on the stand so he could "argue to the jury . . . inferences based on the silence of the individual invoking the Fifth Amendment."

On appeal, however, Robinson contradicts his statement at trial by arguing that he was "deprived of having the jury assess the logical inferences to be drawn from Terrell Reed's assertion of the privilege." Brief for appellant at 28. A defendant may not on

appeal assert a different ground for his objection to the admission or exclusion of evidence than was offered to the trier of fact. See *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002).

Notwithstanding Robinson's present argument, we conclude that the trial court did not abuse its discretion in refusing to make the witnesses assert their Fifth Amendment privilege in front of the jury. In jury cases, the Nebraska rules of evidence provide that "proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury." Neb. Evid. R. 513, Neb. Rev. Stat. § 27-513 (Reissue 1995). The claim of a privilege is not a proper subject of comment by judge or counsel, and no inference may be drawn therefrom. *Id.*

This court has not previously addressed the question of whether a trial court may exercise discretion to allow the defendant to call witnesses to the stand whom the court knows will invoke their Fifth Amendment privilege against self-incrimination. Robinson encourages us to follow the approach suggested in *Gray v. State*, 368 Md. 529, 796 A.2d 697 (2002). The State encourages us to follow the approach of *U.S. v. Reyes*, 362 F.3d 536 (8th Cir. 2004). Although the facts of these cases differ, their conclusions are consistent. They both conclude essentially the following: Although a trial court has some discretion in whether to allow a defendant to call witnesses who will merely invoke their privilege against self-incrimination, such discretion should be exercised only in limited circumstances.

In *Gray*, the defense theory was that another person had committed the crime. The man in question had been with the victim before she was killed, and he had told someone that he had killed the victim. Outside the jury's presence, the court determined that the man the defendant had subpoenaed could properly invoke his Fifth Amendment privilege. The defendant asked the court to make the witness assert his privilege in front of the jury, but the court refused, believing it had no discretion to do so.

On appeal, the Maryland Court of Appeals concluded that a trial court has some discretion to consider permitting a defendant in a criminal case to call a witness to the stand to invoke his Fifth Amendment privilege in the presence of the jury if the trial court first determines that sufficient believable evidence has

been presented to make the matter relevant, i.e., evidence of the possible guilt of such witness. *Gray v. State, supra.* Sufficient evidence must be presented so that any trier of fact might possibly and reasonably believe that the proposed witness might have committed the crime instead of the defendant. *Id.* Because the appellate court reversed on other grounds, it did not determine whether the trial court had actually abused its discretion in refusing to compel the witness to assert his Fifth Amendment privilege in front of the jury.

In *Reyes*, a participant in a drug ring had made statements to undercover agents linking the defendants to the drug conspiracy. The defendants called the participant as a witness, but the witness informed the trial court he would invoke the Fifth Amendment as to all questions. The court held a hearing, inquired of the defendants what questions they planned to ask, determined that the witness' assertion of privilege was valid, and prohibited the defendants from calling the witness to the stand.

The Eighth Circuit concluded that the trial court had not abused its discretion when it refused to require the witness to assert his privilege in the jury's presence. The Eighth Circuit reasoned as follows:

> Very rarely will [the evidence] rules allow a party to argue inferences from a witness's privilege invocation. *See United States v. Doddington*, 822 F.2d 818, 822 (8th Cir. 1987) ("[A] defendant does not have the right to call a witness to the stand simply to force invocation of the right against self-incrimination in the presence of the jury.") (citing *United States v. Lyons*, 703 F.2d 815, 818 (5th Cir.1983)). A third party's privilege invocation is not often relevant. And even if the party seeking to argue the inference concocts a reason that the silence may be relevant, the danger of unfair prejudice usually outweighs the probative value because there is no way the opponent can test the meaning attributed to the invocation. [*U.S. v.*] *Deutsch*, 987 F.2d [878,] 884 [(2d Cir. 1993)]. On cross-examination, a witness who is asked why she invoked the privilege will undoubtedly respond with another privilege assertion. Also, due to the courtroom drama an invocation creates, the jury is likely to place far too much emphasis upon an

ambiguous invocation. *Id.* Thus, absent extraordinary circumstances, trial courts should exercise their discretion to forbid parties from calling witnesses who, when called, will only invoke a privilege.

*U.S. v. Reyes*, 362 F.3d 536, 542 (8th Cir. 2004).

Robinson argues that the trial court erred with regard to Terrell Reed's statement because it thought it had no discretion to require Reed to assert his privilege in open court and, therefore, the court never engaged in an analysis of the relevance of Reed's asserting the Fifth Amendment before the jury. We conclude that absent extraordinary circumstances, trial courts should exercise their discretion to forbid parties from calling witnesses who, when called, will only invoke a privilege. The record does not show such extraordinary circumstances which might have given the trial court discretion to permit Robinson to call the witnesses just for the purpose of having them invoke their Fifth Amendment privilege. See *U.S. v. Reyes, supra.*

In the present case, Robinson has not presented sufficient believable evidence of the possible guilt of Terrell Reed in the shooting of Daniel Lockett. See *Gray v. State*, 368 Md. 529, 796 A.2d 697 (2002). Robinson wanted to present statements made by Victor Hill to a police officer that Terrell Reed had told Hill he was planning to retaliate for the murder of his brother and that Reed was carrying a gun when he made the statement. Robinson claimed that Hill had refused to testify, and therefore, Robinson wanted the police officer to testify as to Hill's statements. However, that evidence was ruled inadmissible as hearsay. Robinson also wanted to question Reed concerning his whereabouts at the time of Daniel Lockett's shooting, but Reed indicated he would refuse to answer such questions on Fifth Amendment grounds.

The trial court did not abuse its discretion in refusing to compel Gary Lockett and Terrell Reed to assert their Fifth Amendment privilege in front of the jury.

(c) Request to Compel State to Grant Immunity

When the trial court refused to require Gary Lockett and Terrell Reed to testify, Robinson asked the court to order the State to grant immunity to Lockett and Reed. The State objected

that granting immunity to these witnesses would jeopardize on-going investigations. The court denied Robinson's request.

Trial courts in Nebraska do not have inherent authority to confer immunity. In a criminal proceeding, a court's authority to grant immunity to a witness who refuses to testify on the basis of the privilege against self-incrimination comes from Neb. Rev. Stat. § 29-2011.02 (Reissue 1995). It provides that

> the court, on motion of the county attorney [or] other prosecuting attorney . . . may order the witness to testify . . . . [N]o testimony or . . . any information directly or indirectly derived from such testimony . . . may be used against the witness in any criminal case except in a prosecution for perjury, giving a false statement, or failing to comply with the order of the court.

*Id.* This statute does not authorize a grant of immunity to a witness except upon the motion of the prosecuting attorney. *State v. Starks*, 229 Neb. 482, 427 N.W.2d 297 (1988) (affirming trial court's refusal to grant immunity to defense witness after witness invoked Fifth Amendment privilege).

Robinson urges us to adopt the approach taken in *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980). The Third Circuit determined that a trial court has authority to confer judicial immunity in two situations in which the Due Process Clause would compel the granting of immunity to a defense witness. The first involves a situation in which the government's decision against granting immunity is made with the deliberate intention of distorting the judicial factfinding process. The second situation arises when the defendant is prevented from presenting exculpatory evidence crucial to the defendant's case.

In *Starks*, we did not decide whether the approach set forth in *Smith* should be adopted by this court. We stated, however, that "[a] number of courts have held there is no authority to grant judicial immunity to defense witnesses." *State v. Starks*, 229 Neb. at 490, 427 N.W.2d at 302. For a detailed discussion of such cases, see *State v. Starks, supra.*

We discussed the rationale against granting judicial use immunity in the following manner:

> "As noted by the Second Circuit in [*United States v. Turkish*, 623 F.2d 769 (2d Cir. 1980)] the two major arguments

against granting such judicial use immunity are that the immunity decision would carry the courts into policy assessments which are the traditional domain of the executive branch, and that the immunity would be subject to abuse.

. "We find these arguments persuasive, and agree that the immunity decision requires a balancing of public interests which should be left to the executive branch. . . .

"Nor are we convinced that any safeguards imposed on the grant of judicial use immunity adequately reduces the risk of abuse by co-defendants, co-conspirators, friends, or employees. Whatever may be gained in fairness in a particular trial in which true exculpatory evidence may be obtained only through judicial use immunity, therefore, may well be lost through the subsequent effect of abuse on the integrity of the judicial process as a whole. . . ."

*State v. Starks*, 229 Neb. at 490-91, 427 N.W.2d at 302, quoting *United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982).

In *U.S. v. Serrano*, 406 F.3d 1208 (10th Cir. 2005), the court held that federal district courts do not have inherent authority to grant use immunity to a defendant's witnesses. The court noted that the Third Circuit's ruling in *Government of Virgin Islands v. Smith, supra*, had not been followed by any other federal circuit.

In the case at bar, the trial court did not err in refusing to order the State to grant immunity to the witnesses who invoked their right against self-incrimination.

### 6. EXCLUSION OF EVIDENCE CONCERNING ALIBI OF OTHER SUSPECTS

Robinson's defense included the theory that it was possible Terrell Reed and Keelan Washington were with Dupree Reed at the scene of Daniel Lockett's homicide. Robinson asserts the trial court erred in precluding him from presenting statements given to police by Reed and Washington.

Robinson wanted to offer Terrell Reed's and Washington's statements that they were at a restaurant at the time Daniel Lockett was killed. Robinson claimed he had a witness who would impeach Reed and Washington's alleged alibi that they were at the restaurant at the time of the murder. Robinson wanted to create the inference that Reed and Washington could have been involved in the murder. Reed and Washington were close

friends, and Washington had a green Tahoe. At a sidebar, defense counsel offered to prove that Washington told police he and Terrell Reed were at the restaurant at the time of the shooting but that this alibi had not checked out.

The trial court sustained the State's hearsay objection. Robinson claims he was unfairly prejudiced because he was deprived of the opportunity to create the inference that Reed and Washington may have been involved in Daniel Lockett's murder.

■ Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. *Plowman v. Pratt*, 268 Neb. 466, 684 N.W.2d 28 (2004). See, also, rule 801(3). Robinson argues the statements were not hearsay because they were not offered to prove that the assertions were true, but that they were false.

### (a) Hearsay

The issue is whether the out-of-court statements made by unavailable witnesses were not hearsay because they were offered for the purpose of proving that such statements were false. In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *Id.*

In essence, the State argues that if the out-of-court statements were relevant only if they were true or false, then the statements were hearsay. The State relies upon *Brown v. Com.*, 25 Va. App. 171, 177, 487 S.E.2d 248, 251 (1997), in which the court declared:

> "Whether an extrajudicial statement is hearsay depends upon the purpose for which it is offered and received into evidence. If the statement is received to prove the truth [or falsity] of its content, then it is hearsay and, in order to be admissible, must come within one of the many established exceptions to the general prohibition against admitting hearsay."

The State urges us to conclude that the statements at issue were hearsay because they were offered to prove whether the assertions were true or false. It asks us to adopt such a conclusion notwithstanding a line of cases suggesting that a statement is not hearsay when offered to show that the statement is false. Cf. *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986), citing *United States v. Adkins*, 741 F.2d 744 (5th Cir. 1984). The State argues that these cases typically involve fraud charges and that in such cases, the defendant's own statement is used against the defendant to show that the statement was false.

Robinson offered the statements of Terrell Reed and Washington because he claimed they were false. If the statements were admitted, he would then attempt to impeach such statements by other testimony. Robinson wanted to establish that Reed and Washington had lied about where they were at the time of Daniel Lockett's murder. Robinson claimed he had a witness who would testify that Reed and Washington were not at the restaurant at the time of Lockett's murder, but that they arrived there later in the evening.

In *Anderson v. United States*, 417 U.S. 211, 94 S. Ct. 2253, 41 L. Ed. 2d 20 (1974), the government sought to prove that certain parties had engaged in a conspiracy to cast fictitious votes for candidates for federal, state, and local offices. The evidence at trial showed that by using the power of their office, the parties convinced election officials to cast false and fictitious votes on the voting machines and then destroy poll slips so that the number of persons who had actually voted could not be determined except from the machine tally. Two of the parties, Earl Tomblin and John Browning, had given sworn testimony at a hearing on the election contest. At trial, the prosecution sought to prove that Tomblin and Browning perjured themselves at the election contest hearing for the purpose of having the fraudulent votes counted and certified. Other coconspirator defendants objected to the election hearing testimony of Tomblin and Browning on the ground that it was inadmissible against them.

After addressing the question of whether the declaration of one coconspirator could be used against another, the court then considered whether the out-of-court statements of Tomblin and Browning were hearsay.

> Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted. The election contest testimony of Tomblin and Browning, however, was not admitted into evidence in the . . . trial to prove the truth of anything asserted therein. Quite the contrary, the point of the prosecutor's introducing those statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false. The rationale of the hearsay rule is inapplicable as well. The primary justification for the exclusion of hearsay is the lack of any opportunity for the adversary to cross-examine the absent declarant whose out-of-court statement is introduced into evidence. Here, since the prosecution was not contending that anything Tomblin or Browning said at the election contest was true, the other defendants had no interest in cross-examining them so as to put their credibility in issue.

*Anderson v. United States*, 417 U.S. at 219-20.

Other federal courts have followed this determination. See, *United States v. Hathaway*, 798 F.2d 902 (6th Cir. 1986) (when statements are offered to prove falsity of matter asserted, there is no need to assess credibility of declarant of false statement; thus, no purpose would be served by extending definition of hearsay to cover statements offered for falsity of matter asserted); *United States v. Pedroza*, 750 F.2d 187 (2d Cir. 1984) (testimony was not hearsay because it plainly was not offered to prove truth of matter asserted; rather, statement was offered for its patent falsity); *United States v. Adkins*, 741 F.2d 744 (5th Cir. 1984) (statements introduced to prove falsity of matter asserted are not inadmissible as hearsay); *United States v. McDonnel*, 550 F.2d 1010 (5th Cir. 1977) (statements introduced not to prove truth of matter asserted, but to establish foundation for later showing that they were false).

Based upon the reasoning of *Anderson v. United States*, 417 U.S. 211, 94 S. Ct. 2253, 41 L. Ed. 2d 20 (1974), we conclude that the trial court erred in excluding as hearsay the statements of Terrell Reed and Washington. The statements were not offered by Robinson to prove that Reed and Washington were at the restaurant at the time of Daniel Lockett's murder.

 Having concluded that the district court erred in excluding these statements as hearsay, we must now determine whether such error was harmless. In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Neal*, 265 Neb. 693, 658 N.W.2d 694 (2003). In a jury trial of a criminal case, harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004).

> Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

*Id.* at 746, 677 N.W.2d at 173. Accord, *State v. Miner*, 265 Neb. 778, 659 N.W.2d 331 (2003); *State v. Neal, supra.*

We must therefore determine, based upon the entire record, whether the actual guilty verdict rendered was surely unattributable to the error. See *State v. Freeman, supra.* We conclude that the verdict was surely unattributable to the error in excluding the testimony. The jury knew from the beginning of the trial that Terrell Reed was the brother of Terez Reed, who had been killed in a gang-related incident the week before Daniel Lockett was murdered. The jury also knew that Dupree Reed was a brother of Terez and Terrell Reed.

 The State's case was largely based upon the credibility of three witnesses who testified about the shooting. Witness credibility is not to be reassessed on appellate review. *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005). Dupree Reed testified that he participated directly in the shooting by firing his .22-caliber automatic pistol into the house in which Daniel Lockett was shot. He testified that Robinson had stated he thought Gary Lockett murdered Terez Reed. Dupree Reed testified that he and Robinson had driven in Robinson's green Tahoe to a residence where Robinson thought Gary Lockett would be present and that Robinson shot through the window of the house.

Courtney Nelson testified regarding the incident. Nelson said Robinson told him that he thought Gary Lockett killed Terez Reed and that Gary Lockett was affiliated with a rival gang. When Robinson got in the Tahoe to leave the funeral reception, Nelson saw him pull out a 9-mm pistol. James Edwards also testified to his observations of Robinson on the night Daniel Lockett was shot. After Robinson and Dupree Reed fired their guns into the residence, Edwards saw Robinson return to the Tahoe with his 9-mm pistol, and the appearance of the weapon indicated that all rounds had been fired.

Nelson further testified that after Daniel Lockett's murder, Robinson stated he was taking the Tahoe to Kansas or Texas to "get rid of the truck." A police officer in Kansas City observed Robinson getting off a bus from Houston and Robinson told the officer he was returning to Omaha. Evidence also showed that a green Tahoe belonging to Robinson's grandmother was found destroyed in a vacant field in Houston.

### (b) Hearsay Exceptions and Statements Against Penal Interest

Because we have concluded that the exclusion of the alibi statements was error but that such error was harmless, it is unnecessary to address Robinson's arguments that the statements should have been admitted because they were admissions against interest or as residual exceptions to hearsay.

### 7. TESTIMONY OF VICTOR HILL

Under the residual hearsay exception of Neb. Evid. R. 804(2)(e), Neb. Rev. Stat. § 27-804(2)(e) (Reissue 1995), Robinson sought to introduce statements made by Victor Hill to Det. Donald Ficenec. Hill refused to testify, and Robinson wanted Ficenec to testify to what Hill allegedly told him about Terrell Reed. Three days after Daniel Lockett was murdered, Hill allegedly told Ficenec that after the murder of Terez Reed, Terrell Reed was carrying a 9-mm pistol and had stated to Hill that he was going to retaliate for the murder of Terez. The trial court refused to admit these statements, because it concluded that the statements did not bear particularized guarantees of trustworthiness.

In determining whether a statement is admissible under rule 804(2)(e), the residual exception to the hearsay rule, a court considers five factors: a statement's trustworthiness, materiality of the statement, probative importance of the statement, interests of justice, and whether notice of the statement's prospective use as evidence was given to an opponent. *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993). An appellate court will affirm a trial court's ruling on whether evidence is admissible under the residual hearsay exception unless the trial court has abused its discretion. *State v. Garner*, 260 Neb. 41, 614 N.W.2d 319 (2000).

### (a) Trustworthiness

In determining admissibility under rule 804(2)(e), a court must examine the circumstances surrounding the declaration in issue and may consider a variety of factors affecting trustworthiness of a statement. See *State v. Toney, supra*. Hill made his assertions about Terrell Reed during a police interview after Hill was arrested on an unrelated matter.

This court has stated that while analyzing the trustworthiness factor in the context of a declaration against penal interest, "[p]articularly relevant to the determination of trustworthiness is whether the declarant was in police custody when the statement was made, whether the declarant had a motive to mitigate his own criminal liability, and whether the declarant made the statement in response to leading questions." *State v. Hughes*, 244 Neb. 810, 818, 510 N.W.2d 33, 39 (1993). We explained that "[t]hese factors are similar to the factors this court has found relevant when considering whether a hearsay statement is sufficiently trustworthy to satisfy the residual exception to the hearsay rule." *Id.*

The trial court did not abuse its discretion in concluding that Hill's statements to Ficenec were not sufficiently trustworthy to fall within the residual exception to the hearsay rule.

### (b) Notice of Use of Statement

The record in this case does not indicate that Robinson provided pretrial notice of his intent to rely upon the residual hearsay exception, and Robinson does not assert on appeal that he provided such notice. Rule 804(2)(e) provides in part:

> A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

See, also, *State v. Castor*, 262 Neb. 423, 632 N.W.2d 298 (2001); *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990).

■ During the trial, at a hearing outside the jury's presence, defense counsel asserted he was going to ask the trial court to allow a hearsay statement of Victor Hill. "[I]t is not enough that the adverse party is aware of the unavailable declarant's statement; the proponent of the evidence must provide notice to the adverse party of his or her intentions to use the statement in order to take advantage of the hearsay exception in § 27-804(2)(e)." *State v. Boppre*, 234 Neb. at 952, 453 N.W.2d at 429.

In *State v. Leisy*, 207 Neb. 118, 295 N.W.2d 715 (1980), the trial court declined to admit an out-of-court statement offered by the defendant under the residual hearsay exception of rule 804(2)(e). The defendant had not made known to the prosecution his intent to use the hearsay testimony. On appeal, the defendant argued that the giving of notice was unnecessary because the prosecutor knew of the declarant's statement and had not called the declarant. This court noted that although the prosecutor knew of the statement, "[h]e did not know . . . that the defense proposed to use [the declarant's] out-of-court statement." *Leisy*, 207 Neb. at 129-30, 295 N.W.2d at 723. Affirming the trial court's exclusion of the hearsay statement, we held that "the notice requirement is mandatory." *Id.* at 130, 295 N.W.2d at 723.

In *State v. Reed*, 201 Neb. 800, 272 N.W.2d 759 (1978), the trial court admitted, over a hearsay objection, a statement made by a young child to an investigating officer at the crime scene. Although it appeared the child's statement had circumstantial guarantees of trustworthiness, we concluded the court erred in overruling the objection because there had been no compliance with the statutory conditions. We stated that, among other requirements, it did not "*affirmatively appear* that notice of intention to use the statement was timely given to the defendant by the State." (Emphasis supplied.) *Id.* at 807, 272 N.W.2d at 763.

In the present case, it does not affirmatively appear from the record that Robinson gave proper pretrial notice to the State of his intention to use Hill's out-of-court statement under the residual hearsay exception. In light of the circumstances surrounding Hill's statement and the fact that Robinson did not give pretrial notice of his intention to use the residual exception to hearsay, the trial court did not abuse its discretion in excluding the hearsay statement made by Hill to the police detective.

## 8. ALLEGED VIOLATION OF RIGHT TO DUE PROCESS

Robinson claims the exclusion of Terrell Reed's and Victor Hill's statements deprived him of presenting a complete defense and violated his due process rights under *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). Robinson's claim is without merit.

In *Chambers*, a third party had confessed, via a sworn written statement prepared for the defendant's attorneys, to killing the victim. This confession was later renounced by the third party. On three other occasions, this person had admitted to killing the victim. Because the defendant was prevented from presenting this aspect of his defense at trial due to a strict application of the state's hearsay rules, the U.S. Supreme Court held that the defendant had been deprived of a fair trial.

The Court determined the defendant should have been permitted to present the third party's confessional statements, which "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Chambers v. Mississippi*, 410 U.S. at 300. The confessions were made spontaneously to close acquaintances shortly after the murder. Each one was corroborated by other evidence in the case. Each was self-incriminatory and against interest. Finally, "if there was any question about the truthfulness of the extrajudicial statements, [the third party] was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." 410 U.S. at 301.

The present case differs from *Chambers*. There was no evidence providing assurances of trustworthiness for Terrell Reed's and Hill's statements. Neither witness was available for cross-examination by the State. Neither witness confessed to killing

Daniel Lockett. Thus, Robinson's argument is without merit, and the trial court's exclusion of the hearsay statements in question did not deprive him of a fair trial.

### 9. ALLEGED PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS

During closing arguments, the prosecutor made the following remarks to the jury:

> You know, who this case is about has continuously gotten lost. I don't know if all you right now can write down that man's name. The man's name is Daniel Lockett and in this milieu of gang violence and retaliatory murders, he had risen above that. He didn't belong to it, and for that he gets killed. And you stack his body up next to Terez Reed and Samuel Hodges [a friend of Courtney Nelson] and Antonio Witherspoon and White Boy [a friend of James Edwards], and the body count rises and it continues to rise.

Defense counsel objected to these remarks as improper argument, but the trial court overruled the objection. Robinson claims the court's failure to sustain his objection constituted reversible error.

A prosecutor's argument must be based on evidence introduced rather than on matters not in evidence. *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989). Robinson asserts that although evidence had been presented that Hodges and Witherspoon were dead, no evidence established the death of "White Boy," and Robinson further asserts that no evidence supported that those three were homicide victims.

We need not determine whether the prosecutor's comments were improper or inflammatory or whether they were sufficiently prejudicial to constitute error, because the record indicates that Robinson failed to preserve this issue for appellate review in that he failed to move for a mistrial. When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *Id.* A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court

erred in not declaring a mistrial due to such prosecutorial misconduct. *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997).

In *Fahlk*, the State referred to the assertion of marital privilege in its closing arguments. The prosecutor remarked: " 'You didn't hear from the third person, did you? It's [the defendant's wife].' " 246 Neb. at 847, 524 N.W.2d at 50. Defense counsel objected but did not move for a mistrial. On appeal, this court opined that the claim of a privilege was not a permissible subject of comment by counsel under rule 513, and we considered the comment regarding the assertion of marital privilege to be prosecutorial misconduct. Nevertheless, we concluded that the defendant's failure to move for a mistrial waived any error resulting from the prosecutor's misconduct.

In the present case, Robinson objected to the prosecutor's closing argument, but he did not move for a mistrial based upon the remarks of the prosecutor. As a result, he has waived any error resulting from the prosecutor's remarks.

### 10. CUMULATIVE ERROR

Robinson's final argument is that the alleged errors committed by the trial court are not harmless and, taken together, deprived him of a fair trial. His argument based on the doctrine of cumulative error is without merit.

### 11. SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE

The trial court sentenced Robinson to life imprisonment without parole for his conviction of first degree murder, which was classified as a Class IA felony. At the time Daniel Lockett was murdered, the penalty for a Class IA felony was life imprisonment. See Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2000). Thus, the trial court had statutory authority to impose a sentence of life imprisonment for the first degree murder conviction, but it lacked authority to add the phrase "without parole." See *State v. Conover*, 270 Neb. 446, 703 N.W.2d 898 (2005) (holding that sentence was erroneous but not void where sentence of life imprisonment without parole was imposed for first degree murder under unconstitutional penalty statute). See, also, *State v. Rouse*, 206 Neb. 371, 293 N.W.2d 83 (1980); *Draper v. Sigler*, 177 Neb. 726, 131 N.W.2d 131 (1964) (both holding that indeterminate

sentence imposed for crime, where not authorized by statute, was erroneous but not void).

 Robinson has not assigned as error his sentence on the murder conviction; however, an appellate court always reserves the right to note plain error which was not complained of at trial or on appeal. See *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003). This court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced. *State v. Conover, supra.* We conclude that in this case, the erroneous imposition of a sentence of life imprisonment without parole warrants a remand with directions that the trial court is to resentence Robinson to life imprisonment for the first degree murder conviction.

## VI. CONCLUSION

The trial court did not commit reversible error as to Robinson's convictions for first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a felon, and we affirm the judgments of conviction. We also affirm the sentences for use of a deadly weapon to commit a felony and use of a firearm by a felon. However, we vacate the sentence of life imprisonment "without parole" and remand the cause to the trial court with directions to resentence Robinson to life imprisonment on the conviction of first degree murder.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED WITH DIRECTIONS
FOR RESENTENCING.